UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CURTIS SUMMIT,

                                    Plaintiff,

                    -v-

EQUINOX HOLDINGS, INC.,

                                    Defendant.

---

20 Civ. 4905 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves claims of age discrimination by a boxing instructor.  Plaintiff Curtis

Summit ("Summit") brings claims against defendant Equinox Holdings, Inc. ("EHI" or

"Equinox"), under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et*

*seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*, and

the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101 *et seq.*

Summit worked as a boxing instructor for Equinox between December 1999 and December 20,

2019, when he was terminated, the day after an incident in an Equinox locker room in which he

was reported to have made a threat of violence.  Summit alleges that Equinox both discriminated

against him during his employment and then terminated him because of his age.

With discovery now complete, Equinox moves for summary judgment.  Summit opposes

the motion.  For the following reasons, the Court grants Equinox's motion in full.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

EHI is a fitness company that operates under the brand Equinox.  JSUF ¶ 1.  Equinox

operates multiple fitness clubs in Manhattan.  *Id.* ¶ 2.  Members can register for fitness classes

taught by Group Fitness Instructors ("GFIs"), who are Equinox employees.  *Id.* ¶¶ 3, 6.

On or about December 7, 1999, Summit—then age 38 and previously a professional

boxer—began working for Equinox as a GFI.  *Id.* ¶ 13; Pl. 56.1 ¶ 3.  As such, Summit taught

boxing classes at Equinox facilities across Manhattan, including at 14 Wall Street (the "Wall

Street Club") and 897 Broadway (the "Flatiron Club").  JSUF ¶¶ 2, 19, 24, 30.  In 2019, Summit

led approximately 10 boxing sessions per week; these were popular and often over-subscribed.

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on
the motion for summary judgment, including: the parties' joint statement of undisputed facts,
Dkt. 31 ("JSUF"); defendant's Local Rule 56.1 statement, Dkt. 38 ("Def. 56.1"); plaintiff's
counter-statement, Dkt. 42 ("Pl. 56.1"); defendant's reply to the counter-statement, Dkt. 47
("Def. Reply 56.1"); the declarations of Gerard Calvo, Dkt. 35 ("Calvo Decl."), Ryan
Echevarria, Dkt. 36 ("Echevarria Decl."), Stephanie Hermann, Dkt. 37 ("Hermann Decl."),
Tracey Grossman, Dkt. 45 ("Grossman Decl."), and Wil Diaz, Dkt. 46 ("Diaz Decl."), in support
of defendant's motion, plus attached exhibits; the declaration of Curtis Summit, Dkt. 41-1
("Summit Decl."), in opposition to defendant's motion; and the depositions of Curtis Summit
("Summit Dep."), Dkt. 41-2, Stephanie Hermann ("Hermann Dep."), Dkt. 41-3, and Tracey
Grossman ("Grossman Dep."), Dkt. 41-7.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When
facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary
evidence and not denied by the other party, or denied by a party without citation to conflicting
admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c)
("Each numbered paragraph in the statement of material facts set forth in the statement required
to be served by the moving party will be deemed to be admitted for purposes of the motion
unless specifically controverted by a correspondingly numbered paragraph in statement required
to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or
opponent . . . controverting any statement of material fact[] must be followed by citation to
evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

*Id.* ¶¶ 20–21. He had not sought to teach private lessons since 2010. Def. Reply 56.1 ¶ 53; Summit Dep. at 169. As of December 20, 2019, Summit was age 59. JSUF ¶ 12.

### 2. Summit's Allegations of Pre-Termination Age Discrimination

Summit's Complaint alleged that in his final year working at Equinox, he was treated differently than similarly situated younger employees. Dkt. 1 Compl. ¶ 16. Summit's claims involve: (1) his having to clean the boxing studios, (2) his having to monitor classroom attendance, and (3) the alleged denial to him of training opportunities.

First, Summit claims, he was instructed by Tracey Grossman ("Grossman"), the regional manager of group fitness, to clean the boxing studios, a task Summit claims younger employees were not asked to perform. Pl. 56.1 ¶ 41; Summit Dep. at 97–98, 116, 132. Equinox club members were expected to return equipment they used during class but did not always do so. JSUF ¶ 7. Summit attests that he had to gather water bottles, towels, and equipment left behind by patrons after classes, although he was never asked to mop floors or clean mirrors in the studios. Pl. 56.1 ¶ 60; Summit Dep. at 65, 110. Collecting these items normally took him two or three minutes; the longest Summit claims he ever spent cleaning a studio was between 10 and 20 minutes. Summit Dep. at 62–63. Summit testified that this cleaning did not affect the number of classes he taught or the number of participants in those classes. Pl. 56.1 ¶ 43; Summit Dep. at 87–88.

Second, Summit claims Grossman ordered him to monitor classroom attendance, which, he claims, younger GFIs were not required to do. Pl. 56.1 ¶ 44; Summit Dep. at 121, 132. Summit claims he was required to track the size of his classes and ensure that members did not get into physical altercations with one another. Summit Dep. at 119; Pl. 56.1 ¶¶ 44–45. Summit, however, has stipulated that all GFIs were expected to monitor classroom sizes to ensure they did not become too big. JSUF ¶ 6; Summit Dep. at 120. Summit also acknowledges he was required

3

to monitor classroom attendance before 2019, the year in which he met Grossman.  Summit Dep. at 89, 132–33.

Third, Summit claims that internal training opportunities were made available to younger fitness instructors but not to him.  *Id.* at 136; Pl. 56.1 ¶ 46.  These included programs to help instructors improve their classes and learn new routines.  Summit Dep. at 133, 135.  Equinox attests that, in fact, these trainings, mandatory for instructors wishing to teach "signature classes," were offered to all GFIs.  Def. Reply 56.1 ¶ 54; Calvo Decl.¶¶ 16–18.  Information on trainings like these and other educational opportunities was normally shared with GFIs via email.  Def. Reply 56.1 ¶ 54; Calvo Decl. ¶ 19.  Summit had a work email account to which such invitations would have been sent but, he testified, he "never really checked" it.  Def. Reply 56.1 ¶¶ 54–56; Summit Dep. at 46, 137–138.  Summit conceded that it was possible he received these emails but never saw them.  Def. Reply 56.1 ¶ 57; Summit Dep. at 137–38.  Summit theorizes that other instructors were given trainings because their classes, unlike his, were not always full.  Summit Dep. at 135.  He states that other instructors told him that their managers told them to enroll in the trainings.  *Id.* at 134.

Summit also claims that, during his time at Equinox, he was subjected to comments and questions about his age.  Pl. 56.1 ¶ 63.  Summit alleges that he had been "consistently" asked about his age by Equinox employees in the 10 years leading to his termination.  *Id.* ¶ 40.  He attests that at several points in 2019, including in late November or early December, Grossman asked him how old he was.  *Id.* ¶ 65; Summit Dep. at 83, 91.  Grossman denies ever asking Summit about his age, and testified that, throughout his employment, she was unaware of his age.  Def. Reply 56.1 ¶ 65; Grossman Dep. at 18–19.

### 3.    The Events of December 13, 2019

On December 13, 2019, Equinox received a complaint from an employee working at a Juice Press shop located within the Wall Street Club. JSUF ¶¶ 22–23. The employee stated that a boxing instructor asked her "what kind of drink would you get if you are horny?" *Id.* ¶ 23.

The general manager of the Wall Street Club reported this interaction, by email, to Stephanie Hermann ("Hermann"), EHI's regional director of people services. *Id.* ¶ 24. The email identified Summit as the instructor who had made the comment. *Id.* Hermann began an internal investigation, and contacted Grossman and Gerard Calvo ("Calvo"), EHI's regional director of group fitness. Hermann gave both Grossman and Calvo an investigation guide, which Equinox managers use to conduct investigations after employee complaints. *Id.* ¶¶ 26–27.

On December 17, 2019, Calvo emailed Summit requesting a meeting with him and Grossman on the morning of December 20, 2019, at the Equinox fitness center located at 45 Rockefeller Plaza (the "Rock Center Club"). *Id.* ¶ 28. On December 19, 2019, Summit responded, confirming the meeting for the next day at 10 a.m. *Id.* ¶ 29.

### 4.    The Events of December 19, 2019

On December 19, 2019, Summit taught a 7 p.m. boxing class at the Flatiron Club. *Id.* ¶ 30. He arrived at the club at 6:45 p.m. and went to the men's locker room to place his personal items in lockers. *Id.* ¶¶ 31–32. Each locker at the club has a four-digit dial lock that allows a user to create a custom code using digits from 0–9. *Id.* ¶ 33. Equinox staff have keys to the lockers and can assist members when they forget their lock combinations. *Id.* ¶¶ 10–11. Summit testified that he deposited his items in three lockers and proceeded to the third-floor boxing studio for his class. Pl. 56.1 ¶ 12.

After teaching, Summit returned to the locker room and found his lockers opened and belongings scattered across the floor. JSUF ¶ 35. Summit became upset, not knowing who had removed his items. *Id.* ¶¶ 36–38. Summit asked other employees for assistance and spoke with Ryan Echevarria ("Echevarria"), the front desk manager on duty, and a maintenance employee named Efrain.[2] *Id.* ¶¶ 39, 45. Summit began yelling when no employee could explain how his items ended up on the floor. Pl. 56.1 ¶ 16; Summit Dep. at 201. Summit testified that he does not recall what he said during this interaction because he was "upset." Pl. 56.1 ¶ 17; Summit Dep. at 206. Summit then took his items and left the club. Pl. 56.1 ¶ 18. He never learned how his belongings had come to be removed from the lockers. JSUF ¶ 41.

Equinox obtained written accounts of what occurred in the locker room from both Efrain and Echevarria. *Id.* ¶¶ 42, 45, 47. In his statement, taken on December 30, 2019, 10 days after Summit was fired, *id.* ¶ 45, Efrain stated that Summit "arrived and hung his jacket on the outside of the locker door and placed his boxing mittens on the floor in front of the locker. He left the locker room for a couple of hours. Upon his return to the locker room, he called me over and was very upset. He accused me of touching his things and moving them around. I called Manuel over for assistance and shortly thereafter that they notified MOD [manager on duty] Ryan [Echevarria] to come into the locker room." *Id.* ¶ 46.

In his statement, Echevarria stated that Summit had "made threats to hit someone (looking at maintenance [staff members]) if he found out who did it," referring to the scattering of his personal items on the floor. *Id.* ¶ 43; Echevarria Decl. ¶¶ 7–13. In response, Echevarria asked Summit to calm down and refrain from making threats. Echevarria Decl. ¶ 12. Echevarria memorialized his encounter with Summit in a December 19, 2019, email to Wil Diaz, the

---

[2] Efrain's last name was not provided in any materials submitted to the Court.

Flatiron Club's general manager,[3] noting that Summit had said a similar incident had happened a few months earlier.  JSUF ¶¶ 42, 44.

After receiving Echevarria's email that night, Diaz forwarded it to Hermann and Grossman, who forwarded it to Calvo.  *Id.* ¶ 47.  When Grossman received this email, she "did not consider terminating" Summit.  *Id.* ¶ 48.  Early the next morning, Calvo emailed Hermann seeking advice on how to broach the events at the Flatiron Club during the upcoming (10 a.m.) meeting with Summit regarding the Juice Press employee's complaint.  *Id.* ¶ 49.  Hermann and Calvo then spoke by phone about amending the investigation guide to include questions about the locker room incident.  *Id.* ¶ 53.  Hermann subsequently sent Calvo an updated guide to use at his meeting with Summit.  *Id.* ¶ 54.

Hermann also emailed Matthew Herbert, EHI's vice president for global people services, and David Ard, EHI's chief people officer, Hermann Dep. at 34,[4] regarding Summit's behavior in connection with the locker room incident.  *Id.* ¶¶ 50–51.  Hermann described Summit as having "become erratic, screaming at employees and accusing the maintenance associate of touch[ing] his stuff (no items were missing) . . . . [D]uring this interaction, [Summit] made threats, somewhat directed at the maintenance employee, that he would beat up the person when he found out who did this."  *Id.* ¶ 51.  Hermann warned Herbert and Ard of "an expected GFI termination."  Pl. 56.1 ¶ 72.[5]

---

[3] At some point that day, Summit testified, Diaz asked him his age.  Pl. 56.1 ¶ 66; Summit Dep. at 24.  Diaz denies ever doing so.  Def. Reply 56.1 ¶ 66; Diaz Decl. ¶ 6.

[4] Although the summary judgment record furnished to the Court does not supply Ard's title, Equinox identified him as above in its reply memorandum of law.  Dkt. 43 ("Def. Reply") at 3.

[5] Hermann's communications that morning preceded the 10 a.m. meeting between Calvo, Grossman, and Summit.  JSUF ¶¶ 49–54.

Hermann's basis for predicting this outcome was his belief that Summit, by threatening to "beat up" another person, had likely violated Equinox's workplace violence policy. JSUF ¶ 51; Dkt. 44, Ex. M. That policy prohibits "actual or threatened violence in the workplace," JSUF ¶ 17, such as "behaving in a violent or threatening manner . . . intimidation of or attempts to instill fear in another individual" and "behaviors that suggest propensity towards violence including . . . veiled threats of physical harm." Dkt. 44, Ex. L. Violation of this policy can result in termination. *Id.*; JSUF ¶ 18. In 2019, Equinox terminated four other employees who made threatening remarks to other employees. Def. 56.1 ¶ 33. Each was younger than Summit. *Id.* ¶ 34. At all relevant times, Summit was aware of this workplace violence policy. *Id.* ¶ 2.

### 5.   Summit's Termination on December 20, 2019

At 10 a.m. on December 20, 2019, Summit met, as scheduled, with Calvo and Grossman at the Rock Center Club. JSUF ¶ 55. Summit was asked about both the Juice Press incident and his conduct at the Flatiron Club the previous night. *Id.* ¶ 57. As to the former, Summit denied the Juice Press employee's allegations; the parties agree that Summit's ensuing termination was not based on that incident. *Id.* ¶¶ 58, 65. As to the locker room incident, Summit told Calvo and Grossman "that he did not directly threaten any specific employee." *Id.* ¶ 59. Summit also testified that he told Grossman and Calvo that the incident in the locker room could have been a set up.[6] Pl. 56.1 ¶ 71.

At some point in the meeting, Summit testified, Calvo asked him about his age, to which Summit responded "60"; however, Summit elsewhere in his deposition testified that he did not disclose his age to Calvo. Def. Reply 56.1 ¶ 64; Summit Dep. at 101–02. Calvo denies asking

---

[6] In this vein, Summit testified that he told Calvo and Grossman that he had heard a person in the locker room—whom he could not identify—state that the incident was an effort to "set me up." Pl. 56.1 ¶ 71; Summit Dep. at 218.

Summit about his age.  Def. Reply 56.1 ¶ 64; Calvo Decl. ¶ 31.  Summit also claims that, at the

meeting, Grossman stated that Equinox had "been trying to get rid of you for the longest." *See*

Pl. 56.1 ¶ 38; Summit Dep. at 232.  Grossman denied making such a statement.  Grossman Decl.

¶¶ 3–4.  At the end of the meeting, Calvo and Grossman told Summit he would be suspended

until their investigation was completed.  JSUF ¶ 61.

Calvo and Grossman then recounted the meeting with Summit by phone to Hermann,

who recommended that Summit be terminated.  *Id.* ¶¶ 62–63.  Hermann testified that she had not

been aware of Summit's age at the time she made this recommendation, and that she had based

this recommendation on the belief that he had violated Equinox's workplace violence policy.

Def. Reply 56.1 ¶¶ 26–27.

Calvo and Grossman agreed with Hermann's recommendation.  JSUF ¶ 64.  At or about 5

p.m. that afternoon, Calvo and Grossman called Summit to tell him he was being terminated.  *Id.*

¶ 66.  Calvo later emailed supervisors at the fitness clubs at which Summit taught to inform them

of his termination and request they organize replacement coverage.  *Id.* ¶ 68.

Equinox did not hire a new trainer to replace Summit.  *Id.* ¶ 69.  Instead, when martial

arts instructors already employed at Equinox could not cover one of Summit's classes, the class

was removed from the schedule.  *Id.* ¶¶ 70–71.  All the instructors whom Equinox found to cover

Summit's classes were younger than Summit at the time of his termination.  *Id.* ¶ 71.  However,

of the nine martial arts instructors employed by Equinox in New York City, all were over age 40

and three were over age 50.  Def. Reply 56.1 ¶ 31.

## II.    Procedural History

On June 26, 2020, Summit filed the Complaint.  Dkt. 1.  On September 8, 2020, Equinox

answered.  Dkt. 7.

On August 6, 2021, after the close of fact discovery, the parties filed a joint statement of undisputed facts, Dkt. 30, and, on August 19, 2021, a revised version of the same, Dkt. 31. On September 3, 2021, Equinox filed a motion for summary judgment, Dkt. 32, an accompanying memorandum of law, Dkt. 33 ("Def. Mem."), supporting declarations from Calvo, Dkt. 35, Echevarria, Dkt. 36, and Hermann, Dkt. 37, and a Rule 56.1 statement, Dkt. 38.

On September 29, 2021, Summit submitted his opposition brief, Dkt. 40 ("Pl. Mem."), his declaration, Dkt. 41, and his counter-statement to Equinox's Rule 56.1 statement, Dkt. 42. On October 15, 2021, Equinox submitted its reply, Dkt. 43 ("Def. Reply"), declarations from Grossman, Dkt. 45, and Diaz, Dkt. 46, and its reply to Summit's Rule 56.1 counter-statement, Dkt. 47.

## III.    Applicable Legal Principles

### A.    Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party

must establish a genuine issue of fact by "citing to particular parts of materials in the record."

Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

Although "an extra measure of caution is merited" in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence," courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted).

### B.    Discrimination Claims Under the ADEA

Summit brings claims of discrimination under the ADEA, NYSHRL, and NYCHRL. The Court first addresses the ADEA, whose legal standards are distinct from those of the NYSHRL and NYCHRL.

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). In the Second Circuit, courts analyze age discrimination claims under the ADEA using the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).

Under that framework, an ADEA plaintiff bears the initial burden of establishing a *prima facie* case of employment discrimination.  This means showing that (1) he was within the protected age group; meaning he was age 40 or above; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) such action occurred under circumstances giving rise to an inference of discrimination.  *Id.* at 106–07 (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000)); *see* 29 U.S.C. § 631(a) (ADEA protects people over age 40).  If the plaintiff does so, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse act]."  *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 571 (S.D.N.Y. 2010) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487 (2d Cir. 2009) (internal quotation marks omitted)).  The defendant's burden is "one of production, not persuasion."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).

If the defendant satisfies this requirement, on a motion for summary judgment, the plaintiff "'must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action' and not just a contributing or motivating factor."  *Gorzynski*, 596 F.3d at 106 (quoting *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 180 (2009)).  In other words, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  *Leibowitz*, 584 F.3d at 499 (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)); *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 694 (2d Cir. 2013) (summary order) (in third step of burden-shifting framework, "plaintiff must prove that the employer's proffered reason was a pretext for discrimination") (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)).

Here, Summit claims that, based on his age, he was (1) subjected to discriminatory treatment in the year leading up to his termination, and, later, (2) terminated. The Court applies the *McDonnell Douglas* framework to these two claims in turn.

## IV.    Summit's ADEA Claim of Pre-Termination Discrimination

Summit claims that, during his employment, Equinox discriminated against him on the basis of his age, in that he was instructed to complete tasks that younger GFIs were not assigned and was denied internal training opportunities. Pl. Mem. at 2.

### A.    *Prima Facie* Case

The evidence clearly establishes the first two requirements for a *prima facie* case of employment discrimination: The parties do not dispute that Summit was (1) over age 40 at all relevant times, and (2) qualified for the position that he held for approximately 20 years. JSUF ¶¶ 12, 14. The parties dispute whether Equinox's alleged pre-termination conduct (3) constituted a "material adverse action", and (4) occurred under circumstances permitting an inference of discrimination. Def. Mem. at 14, 17. The burden to establish a *prima facie* case "is not a heavy one." *Gorzynski*, 596 F.3d at 107. Nonetheless, the evidence adduced by Summit is insufficient to meet it. Even viewing that evidence in the light most favorable to Summit, no reasonable juror could find Equinox's pre-termination conduct a material adverse event, or to have occurred under circumstances giving rise to an inference of discrimination.

### 1.    Did Summit Experience a Materially Adverse Change to the Terms and Conditions of His Employment?

To establish a "materially adverse event," a plaintiff must demonstrate that he suffered from a "'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations and quotation marks omitted). Although termination and the diminution of wages are paradigmatic such changes, the

ADEA covers "less flagrant" conduct as well. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997); *see also Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (identifying other material adverse actions as including "a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or some other action deleterious to the plaintiff's current or future employment"). However, a material adverse action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *See Galabya*, 202 F.3d at 640.

Here, Summit identifies three circumstances that he contends were materially adverse actions as to him: (1) his having to clean the boxing studios, (2) his having to monitor classroom attendance, and (3) the alleged denial to him of training opportunities.

The first two are easily set aside. The cleaning Summit alleges consisted of tidying the studios after classes to ensure that none of Equinox's equipment had been stolen. Pl. 56.1 ¶ 42. By Summit's own account, this cleaning normally took him only two or three minutes each time, and the longest he ever spent cleaning a studio was between 10 and 20 minutes. Summit Dep. at 62–63. Summit further acknowledges that the task of cleaning up after his classes did not have any effect on the number of classes he taught or the number of participants in those classes. Pl. 56.1 ¶ 43. As to monitoring attendance, Summit claims he was expected to do so to make sure that classes were not overcrowded and fights did not break out among members. *Id.* ¶ 45. But he concedes that this responsibility was not unique to him—it was shared by every other GFI at Equinox. Summit Dep. at 120; *see also* JSUF ¶ 6.

On this record, in which these tasks were undisputedly routine, brief, and not specific to Summit, a reasonable juror could not find that Equinox's expectation that Summit perform them was a materially adverse employment action. *See Forest v. N.Y. State Off. of Mental Health*, 672

F. App'x 42, 45 n.3 (2d Cir. 2016) (summary order) ("assignments within an employee's job description are generally not materially adverse"); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 254–57 (E.D.N.Y. 2012) (receiving more work and less desirable responsibilities did not rise to the level of adverse employment actions). As such, a reasonable juror could not find that Summit has made out a *prima facie* case with respect to these tasks. *See, e.g.*, *Lee v. N.Y. State Dep't of Health*, Nos. 98 Civ. 5712, 99 Civ. 4859 (RMB) (HBP), 2001 WL 34031217, at *15 (S.D.N.Y. Apr. 23, 2001) (no material adverse events where employee failed to "describe[] how the duties she was performing were inconsistent with the role of her division"); *Pierre v. Napolitano*, 958 F. Supp. 2d 461, 478 (S.D.N.Y. 2013) (requirement to do task that all similarly situated employees had to perform not a "materially adverse action"); *Smith v. City of New York*, 385 F. Supp. 3d 323, 336 (S.D.N.Y. 2019) ("A Plaintiff's subjective 'dissatisfaction with the work assigned,' absent some evidence that the assignment materially worsened Plaintiff's working conditions, 'is insufficient to make out an adverse employment action.'") (quoting *Johnson v. Morrison & Foerster LLP*, No. 14 Civ. 428 (JMF), 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015)).[7]

Summit's third claim of pre-termination discrimination is based on Equinox's alleged failure to offer him certain training programs that were made available to younger employees. Pl. Mem. at 2–3; Pl. 56.1 ¶¶ 46–47. In 2019, Equinox began offering special trainings for GFIs in weight and cardio exercises which would allow them to teach "signature classes." Def. Reply

---

[7] The Second Circuit has similarly declined to find far more invasive workplace conduct a material adverse event. *See, e.g., Mathirampuzha v. Potter*, 548 F.3d 70, 73, 79 (2d Cir. 2008) (incident where a supervisor "grabbed the plaintiff's arm, punched him in the shoulder and the chest, spit in his face, and poked him in the eye" did not qualify as material adverse events because it did not "substantially interfere with or impair his ability to do his job").

56.1 ¶ 54. Summit testified that these classes provided "new routine workouts, new classes, things that [instructors] could [use to] enhance their classes." Summit Dep. at 135. Equinox attests that every instructor (including Summit) was invited to apply and that information on trainings was usually sent over email. Def. Reply 56.1 ¶ 54. Summit claims that he never received these emails and so never applied for any training. Pl. 56.1 ¶¶ 54, 57. At the same time, he admits to not regularly checking his work email account—to which such invitations would have been sent. *Id.* ¶ 55.

For purposes of considering whether the denial of a training opportunity was a material adverse event, the Court assumes *arguendo* that a jury could find that Summit was not offered training opportunities by Equinox, although, as explained below, Summit's admitted failure to check the email account to which Equinox attests it sent these invitations would not permit this finding. To establish that the deprivation of training opportunities was a material adverse event, a plaintiff must demonstrate that he suffered "material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). Summit has not adduced evidence of that here, or even claimed to have done so. And the undisputed evidence would make such a claim untenable. At all relevant times, Summit was a popular trainer whose classes were often over-subscribed. JSUF ¶ 21. And, asked how the training sessions to which he surmises he may not have been invited could have developed his career, Summit responded only, "[Y]ou can always learn something new." Summit Dep. at 134–135; Def. 56.1 ¶ 48.

This adage, without more, would not permit a reasonable jury to find that the denial of training opportunities to Summit worked a materially adverse change to the terms and conditions of his employment. *See Ortiz v. Metro. Transp. Auth.*, No. 13 Civ. 1033 (VSB), 2014 WL

11460929, at *8 (S.D.N.Y. Sep. 30, 2014) (plaintiff did not prove her employer's failure to provide additional training constituted a material adverse event where "she provided no proof that her lack of training actually did have a negative impact on her career"); *Hadman v. Sebelius*, No. 09 Civ. 4414, 2011 WL 4736972, at *5–6 (E.D.N.Y. Oct. 6, 2011) (no material adverse event where plaintiff could not show that denial of training "affected plaintiff's promotional opportunities"); *Sekyere v. City of New York*, No. 05 Civ. 7192 (BSJ) (DCF), 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) ("Plaintiff does not contend that her position was altered in any way by not receiving some specific training, nor does she contend that she was disciplined, demoted, transferred, or terminated for lack of some fundamental knowledge that should have been provided for her through training.  Accordingly, any failure by Defendants to provide Plaintiff with training does not rise to the level of an adverse employment action.").

### 2.    Did the Material Adverse Events Occur Under Circumstances Giving Rise to an Inference of Discrimination?

Even if a reasonable juror could find that Summit experienced a material adverse change to the terms and conditions of his employment at Equinox, to establish a *prima facie* case, he would still need to prove such events occurred under circumstances giving rise to an inference of age discrimination.

To establish an inference of discrimination at the *prima facie* stage, a plaintiff must show that an "employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  To survive a motion for summary judgment, there must be record support for this claim of disparate treatment, and not merely an unsubstantiated claim by the plaintiff. *See Bahnsen v. Town of Brookhaven*, No. 17 Civ. 4545, 2019 WL 7475951, at *11 (E.D.N.Y. Dec. 16, 2019) (granting summary judgment for defendant where plaintiff provided only

"unsupported assertion[s] that younger individuals were treated differently"); *Allen v. A.R.E.B.A. Casriel, Inc.*, No. 15 Civ. 9965 (KPF), 2017 WL 4046127, at *14 (S.D.N.Y. Sept. 12, 2017) (granting summary judgment to defendant in ADEA case where there was "no inference of age discrimination supported by the record").

Here, the evidence does not permit a reasonable inference that any of the circumstances that Summit terms material adverse employment events were attributable to Summit's age.

*Cleaning the studios*:  Summit alleges that he spoke with younger instructors who told him that they were never asked to clean studios after classes.  Pl. 56.1 ¶¶ 49–50; Summit Dep. at 94–95.  These statements, however, are rank hearsay.  They are inadmissible for the truth of the statements the instructors allegedly made to Summit.  And Summit has not adduced admissible evidence to this effect.  Explaining that he "wasn't in contact with a lot of instructors," he could not name any younger employee who told him they were not expected to clean the studios, Def. 56.1 ¶ 50, and the record is devoid of any declaration or testimony by any instructor, or Equinox official, to this effect.

Nor does Summit's other ostensible evidence of his disparate treatment relative to these other instructors permit an inference of discrimination.  Pl. 56.1 ¶¶ 51–53.  Summit does not identify who these instructors were, save to say that two unidentified individuals in their 20s were better treated than he was.  Def. 56.1 ¶ 51.  And the comparisons Summit seeks to draw are not probative of discrimination against him.  As to the first comparator, Summit states that that person, in general, was better treated—in 2016—than Summit was during the period covered by his allegations of discriminatory treatment.  Pl. 56.1 ¶ 52.  But Summit's proposed contrast lacks probative value, both because Summit does not point to any concrete differences in the manner in which he and the comparator were treated, and because the events involving the comparator

occurred 2–3 years before the 2019 events of which Summit complaints, sapping the comparison of value.[8]  As to the second comparator, Summit, when asked to explain how he had been treated worse, responded that the second comparator worked with many private clients.  Summit Dep. at 165.  But that comparison, too, is faulty.  Other than by speculation, it cannot support an inference of age discrimination, given Summit's admissions that (1) he had not sought to work for private clients since 2010; and (2) the second comparator had worked at Equinox longer than Summit.  Def. Reply 56.1 ¶ 53; Summit Dep. at 165, 169.  Summit's comparisons thus do not fairly permit an inference that his cleaning responsibilities were the product of age discrimination.

*Monitoring classroom attendance*:  Contrary to Summit's unsubstantiated claim that he was instructed to monitor classroom attendance while younger GFIs lacked this responsibility, Pl. 56.1 ¶ 44, it is undisputed that all GFIs—regardless of age—are expected to monitor classroom attendance.  JSUF ¶ 6.  And Summit admitted he had had this responsibility before 2019, when, he claims, Grossman commenced age discrimination against him.  Summit Dep. at 89, 119, 121, 132–33.

*Training opportunities*:  Summit contends that his not receiving training available to other GFIs evinces discriminatory intent.  But on the summary judgment record, a jury could not find differential treatment of Summit and younger GFIs other than by speculation.  Equinox has adduced evidence that all GIFs were invited, via work email, to apply for trainings and these

---

[8] Although background evidence from an earlier period, such as statements indicative of ongoing discrimination or retaliation, may sometimes be received, *see Davis-Garett*, 921 F.3d at 42, where a discrimination claim is based on disparate treatment, historical evidence is not a substitute for proof of differential treatment within the period at issue, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

invitations were usually sent over email. Def. 56.1 ¶ 54. And although Summit contends he was

not invited, Pl. 56.1 ¶ 57, he admits that he "never really checked" his work email account. Def.

Reply 56.1 ¶¶ 54–56; Summit Dep. at 46, 137–38. He also concedes it is possible he received

these emails and just never saw them. Def. Reply 56.1 ¶ 57; Summit Dep. at 137–38. On these

circumstances, although a reasonable juror could find other GFIs attended training sessions that

Summit was invited to of which his email-review practices had left him subjectively unaware, a

reasonable juror could not infer that these opportunities were denied based on age discrimination.

*See Risco v. McHugh*, 868 F. Supp. 2d 75, 103 (S.D.N.Y. 2012) (employee failed to marshal

evidence that denial of training could allow for an inference of discrimination); *Mazyck v. Metro.*

*Transp. Auth.*, 893 F. Supp. 2d 574, 588 (S.D.N.Y. 2012) (no permissible inference of

discrimination where plaintiff did not "allege any facts to suggest any particular denial [of

training] was on account" of his protected status); *Joseph v. Owens & Minor Distrib., Inc.*, 5 F.

Supp. 3d 295, 311 (E.D.N.Y. 2014) (plaintiff failed to present evidence that he was denied

trainings offered to other employees that would support an inference of discrimination).

     For the above reasons, the evidence adduced, viewed in the light most favorable to

Summit, would not permit a jury to find a *prima facie* case of age discrimination.

### B.    Legitimate, Nondiscriminatory Reasons

     Even if the evidence permitted a jury to find a *prima facie* case of age discrimination,

Equinox has provided legitimate, nondiscriminatory reasons for the practices at issue. That is all

it must do at this next stage: "introduce evidence which, *taken as true*, would permit the

conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original).

     As to Summit's first two allegations—that an inference of discrimination should arise

from his having to clean the boxing studios and to monitor classroom attendance—Equinox has

provided legitimate, nondiscriminatory reasons for imposing these responsibilities, which, it attests without refutation by admissible evidence, were borne by Summit's younger comparators. And Summit, notably, does not contest that there were sound business reasons to impose these responsibilities on persons in his post. Cleaning ensured that the studios were not hazardous to members and returning equipment to storage prevented theft of company property. Pl. 56.1 ¶ 60; Summit Dep. at 111–12; *id.* at 64 (testifying it was his duty "as a group fitness instructor" to assure that the studios were tidy after his classes). And monitoring attendance prevented classes from becoming overcrowded and unsafe. JSUF ¶ 6; Pl. 56.1 ¶ 61.

As for training opportunities, Equinox adduces admissible evidence that "signature class" trainings were made available by email to *all* trainers (including Summit) regardless of age, Def. 56.1 ¶ 54, and notes that Summit's ignorance that he had been invited to these was logically due to his "never really check[ing]" his work email account, Def. Reply 56.1 ¶¶ 54–57; Summit Dep. at 46, 137–38. This is a patently non-discriminatory explanation for Summit's unawareness that he was welcome at the training classes.

## C.     Pretext/But-For Causation

Because Equinox has come forward with a legitimate non-discriminatory reason for the practices that Summit challenges as age-discriminatory, the burden shifts to Summit to show that these explanations were pretexts for discrimination. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). A plaintiff bringing ADEA claims satisfies that burden by proving, "by a preponderance of the evidence that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (quoting *Gross*, 557 U.S. at 180).

Summit has not done so here. He has not adduced any evidence undermining Equinox's showings as to the age-neutral reasons why he was obliged to clean the boxing studios and to

monitor classroom attendance, and its age-neutral explanation why, despite being sent emails inviting him to training sessions, he did not access them. On these circumstances, Summit could create a disputed issue of material fact only on the impermissible "basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

For the foregoing reasons, the Court grants summary judgment to Equinox on Summit's claims of pre-termination age discrimination.

## V.     Summit's ADEA Claim of Discriminatory Termination

The Court next turns to Summit's age-discrimination claim based on his termination on December 19, 2019. In moving for summary judgment, Equinox counters that the evidence cannot support a finding of age discrimination, and that it terminated Summit on account of his conduct during the locker room incident the previous day. Def. Mem. at 11. As above, the Court applies the *McDonnell Douglas* framework to the evidence bearing on this claim.

### A.     *Prima Facie* Case

Here, Summit undisputedly has satisfied the first three elements of a *prima facie* employment discrimination claim: he (1) was over age 40 at the time of his termination; (2) was qualified for the position from which he was terminated, having held it for approximately 20 years, and (3) suffered an adverse employment action, his termination, *see Gorzynski*, 596 F.3d at 107 (adverse employment action element met by termination). As to the fourth element, although Equinox disputes that Summit's evidence would permit a reasonable juror to find that the termination occurred under circumstances giving rise to an inference of discrimination, Def. Mem. at 11, the Court assumes, *arguendo*, that Summit could make out a *prima facie* case, and focuses its analysis on the ensuing steps in the *McDonnell Douglas* inquiry.

### B.    Legitimate, Nondiscriminatory Reasons

Equinox has adduced evidence that it fired Summit because of his alarming conduct in the locker room the previous day, specifically, his reported threats to hit the person who had touched his belongings.  This threat, Equinox states, violated the company's workplace violence policy, and as such supplied an age-neutral basis for the termination.  Def. Mem. at 12.

It is well established that a violation of a workplace violence policy constitutes a legitimate, nondiscriminatory reason for an employee's termination. *See, e.g., Howell v. Montefiore Med. Ctr.*, No. 13 Civ. 8505 (AT), 2016 WL 880373, at *3, *6 (S.D.N.Y. Feb. 16, 2016) (employer provided a legitimate, nondiscriminatory reason for termination after employee violated workplace violence policy); *Gorecke v. United Parcel Serv., Inc.*, No. 11 Civ. 6591, 2014 WL 1315390, at *2, *6 (W.D.N.Y. Apr. 1, 2014) (employer provided legitimate, nondiscriminatory reason for termination after one employee strangled another in violation of company policy).

In response, Summit counters that whether he actually violated the policy presents a genuine question of material fact, because Summit's locker-room outburst did not contain "specific threats at any given employee" and because he "did not act in a physically violent manner."  Pl. Mem. at 14.  Equinox characterizes this reasoning as "absurd."  Def. Reply at 5.

Equinox has clearly adduced a legitimate, non-discriminatory reason for terminating Summit.  The company's workplace violence policy explicitly prohibits "behaviors that suggest propensity towards violence including . . . veiled threats of physical harm."  Dkt. 44, Ex. L.  The words attributed to Summit by Echevarria in his email to the Flatiron Club's general manager the night of the locker-room incident, even though they did not blossom into actual fisticuffs, were threats that constituted a blatant violation of that policy.  As reported by Echevarria, Summit "made threats to hit someone."  JSUF ¶ 43.  It is also undisputed that that report of Summit's

23

behavior and verbal threat was thereupon forwarded—before the termination decision and before the pre-arranged interview of Summit the following day—to Herrmann, Grossman, Calvo, Ard, and Herbert. *Id.* ¶¶ 47, 50–51. It is further undisputed that, following the interview, the first three of these persons participated in the decision, ultimately made by Hermann, to terminate Summit. *Id.* ¶¶ 62–64.

Equinox has therefore adduced evidence of a legitimate, nondiscriminatory basis for terminating Summit.

### C.     Pretext/But-For Causation

The Court accordingly turns to the final step in the *McDonnell Douglas* inquiry, which probes whether the employer's stated rationale for terminating the employee was a pretext for age discrimination. Summit makes several arguments why a jury could so find. *See* Pl. Mem. at 14. None carry the day.

#### 1.     Alleged Age-Related Comments Made to Summit

First, Summit argues that questions and comments relating to his age, made in asserted "temporal proximity" to his termination, would permit a jury to find pretext. *Id.* On Equinox's motion, the Court must credit that these statements were made and view them, provided they would be admissible at trial,[9] in the light most favorable to Summit. *See, e.g.*, *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 378 (2d Cir. 2003) (considering alleged "comments as true" on summary judgment motion); *Gay v. Terrell*, No. 12 Civ. 2925, 2013 WL 5437045, at *24

---

[9] To be considered on a motion for summary judgment, statements must be admissible at trial, *see* Fed. R. Civ. P. 56; *see also Evans v. Port Auth. of N.Y. & N.J.*, 192 F. Supp. 2d 247, 262 (S.D.N.Y. 2002), *clarified on reconsideration sub nom.*, No. 00 Civ. 5752 (LAK), 2002 WL 1941557 (S.D.N.Y. Aug. 22, 2002), including under the hearsay rules and Federal Rules of Evidence 402 and 403. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *Barkley v. Penn Yan Cent. Sch. Dist.*, 442 F. App'x 581, 585 (2d Cir. 2011) (summary order). No statement at issue here appears to be hearsay, and the Court assumes *arguendo* that each is admissible.

(E.D.N.Y. Sept. 27, 2013) (same).  The Court has done so here.  Nevertheless, for the reasons below, the comments cited by Summit, viewed separately or in combination, would not give a rational finder of fact a basis to find that age discrimination was a but-for cause of his termination.

When evaluating the probative value of remarks in discrimination cases, courts evaluate the following factors:

> (1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).

*Henry*, 616 F.3d at 149.  The more removed remarks are from an employer's adverse action, the more likely they can be considered non-probative "stray remarks."  *See id.*; *see also Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.")).

Here, problematically for Summit, he was frequently unable to identify the person who he alleges made comments about his age.  And the statements of those whom he could name are stray remarks and/or inadmissible.  The statements he alleges are usefully assessed in several categories.

First, Summit vaguely testified that, throughout his time at Equinox, he was asked his age and when he planned on retiring.[10]  Pl. 56.1 ¶ 63.  Summit generally failed to identify the employees who allegedly made these remarks.[11]  Def. Reply 56.1 ¶¶ 37, 63.  Summit also was often unable to situate these statements in time.  Summit Dep. at 20–21, 27.  Absent details as to the speaker and timing, these statements are too vague and unmoored to shed meaningful light on the state of mind of the officials responsible for his termination.  *See Henry*, 616 F.3d at 149; *see, e.g.*, *Huminski v. Stop & Shop Supermarket Co.*, No. 16 Civ. 1136, 2019 WL 4804913, at *4 (D. Conn. Sept. 30, 2019) (fact that "record is silent as to the timing of the . . . remark" was "factor[] weigh[ing] against plaintiff").  As such, these are stray remarks insufficient to generate a material issue of fact.

Even if Summit had been able to attribute these sporadic remarks to specific individuals, they would not be meaningfully probative of Equinox's intent in terminating him.  Critically, he has not attributed almost any of these remarks to the group that, undisputedly, decided to terminate him in the hours following the locker room incident.  And the time lapse between these comments and the termination decision also saps them of probative value.  *See Moore v. Verizon*, No. 13 Civ. 6467 (RJS), 2016 WL 825001, at *9 (S.D.N.Y. Feb. 5, 2016) (comments relating to retirement and hearing loss made four months before plaintiff's first suspension and nearly a year

---

[10] Although Summit alleges he heard discriminatory comments throughout his time at Equinox, he contends that he only began receiving discriminatory treatment more recently.  Pl. Mem. at 2. In the interest of completeness, however, the Court will consider these earlier comments as potentially pertinent background.  *See Davis-Garett*, 921 F.3d at 42 ("relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act") (cleaned up).

[11] Among his more specific attributions, Summit alleges that a "group advisor" working at Equinox named "Rick" asked him his age and when he would stop teaching several times in December 2019.  Summit Dep. at 84–86.

before her termination were "non-actionable stray remarks"); *Sheridan v. N.Y. Life Inv. Mgmt.,*
*LLC*, No. 09 Civ. 4746 (KBF), 2012 WL 474035, at *7 (S.D.N.Y. Feb. 9, 2012) (stray age-
related comment made "nearly four months prior" to adverse employment action "cannot support
an inference" that action was taken with discriminatory intent); *Risco*, 868 F. Supp. 2d at 109
("An isolated remark made approximately four months before [plaintiff's] termination . . . [is]
not evidence of discriminatory intent); *Buckman v. Calyon Secs. (USA) Inc.*, 817 F. Supp. 2d
322, 336 (S.D.N.Y. 2011) (stray remark not probative when made five months before plaintiff's
discharge and other facts did not connect the remark to the discharge).

Second, Summit claims that Grossman, who was a decisionmaker in his termination,
asked him about his age and when he was going to retire, and did so at multiple points in 2019.
Pl. 56.1 ¶ 65; Summit Dep. at 83, 88, 91. At least one of these remarks, Summit claims, was
made in late November or early December, shortly before Summit was fired. Summit Dep. at
91–92. Although Grossman denies ever asking Summit his age or when he expected to retire,
Def. Reply 56.1 ¶ 65; Grossman Dep. at 18–19, the Court, for purposes of this motion, treats
Summit's account of her comments as accurate. Nonetheless, even if Grossman made such an
inquiry within a month of the termination decision on December 20, 2019, there is nothing tying
these general inquiries to that decision itself. *See Smith v. N.Y. & Presbyterian Hosp.*, 440 F.
Supp. 3d 303, 338 (S.D.N.Y. 2020) (finding alleged discriminatory comment nonprobative
where plaintiff could not tie it "to an employment decision"); *Arnow v. Aeroflot Russian Airlines*,
980 F. Supp. 2d 477, 484–85 (S.D.N.Y. 2013) (employer's comments about an employee's
protected status not probative where they did not characterize the motivation behind a

27

termination).  Notably, Summit does not allege that Grossman, before receiving the account of Summit's locker room outburst, militated for his retirement or termination.[12]

Third, on December 19, 2019, the day of the locker room incident, Summit alleges Diaz asked him about his age.  Pl. 56.1 ¶ 66; Summit Dep. at 24.  Diaz denies doing so.  Def. Reply 56.1 ¶ 66; Diaz Decl. ¶ 6.  Even crediting that this statement was made, Diaz, critically, did not participate in the decision to terminate Summit.  Although Diaz received an account of the incident and forwarded it to Hermann, it was, undisputedly, Grossman, Calvo, and Hermann who decided to terminate Summit.  Diaz's alleged comment is thus not evidence of pretext.  *See Evans*, 192 F. Supp. 2d at 262–64 (co-worker's statement could not be imputed to employer, and thus was inadmissible, where there was no evidence that co-worker was plaintiff's supervisor, or played a role in a relevant employment decision, or that the statement related to his duties); *see also Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 202–03 (S.D.N.Y. 2009) (co-worker's statement could not be imputed to employer where there was no evidence she "had anything to do with" the challenged employment decision).

Fourth, Summit alleges that on the day of his termination, Grossman and Calvo made comments about his age.  Summit claims that Calvo asked him how old he was and Summit responded that he was 60.  Def. Reply 56.1 ¶ 64; Summit Dep. at 102.  Similarly, Summit claims Grossman told him Equinox had "been trying to get rid of you for the longest."  Def. Reply 56.1 ¶ 38; Summit Dep. at 232.  Calvo denies this exchange took place, Def. Reply 56.1 ¶ 64; Calvo

---

[12] Summit also claims that he drew the conclusion that Grossman "wanted young people" at Equinox, but he admitted that Grossman "didn't say something like that," Def. Reply 56.1 ¶ 38; Summit Dep. at 232, and never said she "wanted younger employees at its clubs," Grossman Decl. ¶ 4.  Summit's unsubstantiated opinion is not probative of Grossman's motivations.

Decl. ¶ 31, and Grossman testified that at no time did she state that Equinox "was looking to get rid of him." Grossman Decl. ¶ 3.

Although Equinox disputes that these statements were actually made, the Court, on Equinox's motion, must treat them as having occurred. Nonetheless, although evidence of age-related statements the day of the termination presents Summit's most substantial basis for claiming discriminatory motivation, these statements would not permit a rational jury to find Equinox's justification for the termination—Summit's shocking locker room outburst as recorded and reported by employees lacking such a motivation—was pretextual. The case law recognizes that a plaintiff's reports of such comments, unsupported by other evidence of pretext, cannot salvage a discrimination claim, particularly in the face of substantiated evidence of a non-discriminatory basis for the employment action. Otherwise, as the Second Circuit has observed, any terminated employee who testified to having been on the receiving end of a such a remark "would have an instantaneous jury case on discrimination, regardless of the ground for their dismissal." *Danzer*, 151 F.3d at 56; *see also Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 24 (2d Cir. 2011) (summary order) (even if stray remark is treated as probative, "remark was insufficient to allow [plaintiff] to carry her burden in showing that age-discrimination was the 'but-for' cause" of adverse employment decision, given evidence of plaintiff's unsatisfactory job performance); *Hess v. Mid Hudson Valley StaffCo LLC*, 776 F. App'x 36, 37 (2d Cir. 2019) (summary order) (affirming grant of summary judgment to ADEA defendant despite plaintiff's claim that her manager and manager's supervisor made repeated comments that plaintiff was too old to continue working, where plaintiff did not adduce evidence of other indicia of improper animus); *Fletcher v. ABM Building Value*, 775 F. App'x 8, 13 (2d Cir. 2019) (summary order) (affirming grant of summary judgment to Title VII defendants despite plaintiff's sworn statement

that direct and two other supervisors called her "bitch" and "black bitch," and "bubble girl"); *Slattery v. Swiss Reins. Am. Corp.*, 248 F. 3d 87, 93 (2d Cir. 2001) (executive's statement that he intended to make the image of the company younger—made shortly before plaintiff's termination—insufficient to show pretext in light of plaintiff's documented performance issues); *Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41–42 (2d Cir. 2012) (summary order) (affirming summary judgment for defendants on ADEA claims notwithstanding comment by CEO decisionmaker to plaintiff, six weeks before termination, that plaintiff was "71 years of age, how long do you expect to work" as this was insufficient to show that employer's stated reason for termination was pretext); *Downey v. Adloox, Inc.*, 789 F. App'x 903, 906 (2d Cir. 2019) (summary order) (affirming summary judgment for defendants on ADEA claims despite CEO and co-founder's calling terminated plaintiff an "old timer" on two occasions and stating that company was "looking for young sharks").

The age-related comments Summit claims to have heard, viewed in combination, do not create a triable issue of fact that age was the reason for his termination. They do not come close to offsetting the compelling evidence, testimonial and documentary, that the impetus to terminate Summit arose only upon the report of his locker room outburst and threat of retaliatory violence, and that upon receiving that report, all decisionmakers favored Summit's termination.

### 2.    Equinox's Investigation

Summit suggests Equinox conducted a faulty and rushed investigation into his locker room conduct, revealing that its true motive was age discrimination. Pl. Mem. at 14. In particular, Summit notes that Hermann's email to Herbert and Ard describing Summit's "expected termination" was sent before he had been asked about the incident. Pl. Mem. at 4; JSUF ¶¶ 50–52. Summit also argues that Equinox "did not obtain written statements from many alleged witnesses" until after his termination; for example, the statement from Efrain, Equinox's

maintenance employee at the Flatiron Club, was taken on December 30, 2019. Pl. Mem. at 5; JSUF ¶ 45. Summit argues that Hermann's recommendation that he be fired was a rush to judgment and indicative of pretext. Pl. Mem. at 5.

Although Summit is well within his rights to critique Equinox's investigation as hasty and as arguably disrespectful to an employee of 20 years' standing whose record did not reflect prior disciplinary infractions, the issue before the Court is not the design of Equinox's process or the wisdom of its termination decision. It is whether that decisional process, or its substance, is indicative of age discrimination. Significantly, Summit has not identified any part of that decision, or the events between the locker room incident and his termination the next day, indicative of age discrimination. Quite the contrary, as the parties agree, Hermann was unaware of Summit's age at the time she made her recommendation to terminate him. Pl. 56.1 ¶ 27. In making her recommendation to terminate Summit, Hermann relied instead on Diaz's email from the night of December 19, 2019, which documented Summit's conduct at the Flatiron Club that day and his "threats to hit someone," and on her conversation with Calvo and Grossman after their meeting with Summit in which he admitted to becoming upset in the locker room. Def. Reply at 8; JSUF ¶¶ 43, 51, 62–63. This record—and the temporal correlation of the troubling locker room incident and the termination decision—is potent evidence that that incident, and not ageism, catalyzed Summit's discharge. Summit may fairly critique Equinox's decision to fire him without interviewing all percipient witnesses, and for the speed at which it acted. But these aspects of the company's decisional process, even if debatable, do not reveal a triable issue of age discrimination. The Court therefore rejects Summit's argument that imperfections—real or arguable—in the process that Equinox used in deciding to terminate him are indicative of age discrimination.

### 3.    Replacement by Younger Employees

Summit points to his replacement by younger employees as ostensible proof of pretext.

Pl. Mem. at 14.  Equinox did not re-hire someone for Summit's post; other instructors covered

his classes after his termination, JSUF ¶¶ 69–70, and the GFIs who did so were younger than

Summit, *id.* ¶ 71.  This, however, does not evidence that Summit's discharge was a pretext for

age discrimination.  *See, e.g.*, *Hess v. Mid Hudson Valley Staffco LLC*, No. 16 Civ. 1166 (KMK),

2018 WL 4168976, at \*17 (S.D.N.Y. Aug. 30, 2018), *aff'd*, 776 F. App'x 36 ("Typically,

younger workers will replace older ones; this is an unremarkable phenomenon that does not

prove discrimination.") (citations omitted).  And the GFIs who replaced Summit were over age

40, and three were over age 50.  Def. Reply 56.1 ¶¶ 28–31.  Because Summit was replaced by

others within his protected class, this aspect of the events surrounding his termination does not

evince age discrimination.  *See White v. Pacifica Found.*, 973 F. Supp. 2d 363, 381 (S.D.N.Y.

2013) ("The fact that Plaintiff was replaced by a member of the same protected class further

undermines any inference of discriminatory intent.").

### 4.    Equinox's Rebuttal Evidence

Finally, to the extent Summit's ostensible evidence of pretext might gain any traction, the

undisputed evidence marshalled by Equinox solidly rebuts it.  That centrally includes the proof

that the impetus to terminate Summit arose only after the locker room incident.  Equinox also

notes, as is undisputed, that in 2019 it fired four other employees, all younger than Summit, for

threatening comments to other employees.  Def. Reply 56.1 ¶¶ 33–34; Def. Mem. at 7.  That

evidence is circumstantially potent in rebutting Summit's thesis that such conduct was not of

concern to it and that it fired him on account of his age.[13]

---

[13] Summit also testified that he believed the locker room incident was a "set up."  Summit Dep.
at 218.  He has not adduced, however, evidence for this contention.

In the end, Summit's claim that he was terminated based on his age is overwhelmingly conclusory. Asked why he concluded that Grossman's decision to terminate him was based on age, Summit stated that it was the "only thing I can see. Nothing else. It's not like something else was bothering her about me." Pl. 56.1 ¶ 37; Summit Dep. at 157. The direct and circumstantial evidence adduced by Equinox, however, points to a clear alternative explanation: Summit's locker-room threat the previous day, aimed at other employee(s). On the summary judgment record, a reasonable juror could not find that Equinox's documented non-discriminatory reason for terminating Summit—his violation of the company's policy against workplace violence—was a pretext for age discrimination, or that, "but for" Summit's age, he would not have been terminated.

The Court therefore grants summary judgment for Equinox on Summit's age discrimination claim under the ADEA.

## VI.   Summit's Claims Under the NYCHRL

Summit also brings claims of age discrimination under the NYCHRL. Because those claims are before the Court solely under its supplemental jurisdiction—and the Court has granted summary judgment to Equinox on Summit's federal claim—the Court declines to reach the merits of the NYCHRL claims.

"District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *Spiegel v.*

*Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

In this Circuit, NYCHRL claims must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Given the "slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims at the summary judgment stage," *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 835 (S.D.N.Y. 2013), the separate and independent inquiry the Court would need to undertake in this "evolv[ing]" area of law, *see id.* at 835 n.6, and that the parties have not briefed the NYCHRL claims distinctly and adequately, the factors of convenience, comity and judicial economy favor declining jurisdiction over Summit's NYCHRL claims, *see, e.g., Ehrbar*, 131 F. Supp. 3d at 37 (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Downey v. Adloox Inc.*, No. 16 Civ. 1689 (JMF), 2018 WL 5266875, at *9 (S.D.N.Y. Oct. 23, 2018) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting summary judgment for defendants with respect to ADEA and NYSHRL claims); *Triana v. Sodexo, Inc.*, No. 15 Civ. 5895 (RA), 2018 WL 6413151, at *8

(S.D.N.Y. Dec. 5, 2018) (declining to exercise supplemental jurisdiction over NYCHRL claims

after granting defendants summary judgment as to federal law claims).

Accordingly, the Court declines to exercise supplemental jurisdiction over Summit's

claims under the NYCHRL.  Summit's age discrimination claims under city law are therefore

dismissed, without prejudice to his right to re-file them in state court.

## VII.   Summit's Claims Under the NYSHRL

Summit also brings claims of age discrimination under the NYSHRL, over which the

Court also declines to exercise supplemental jurisdiction.

Until recently, courts have adjudicated claims brought under the ADEA and NYSHRL

together, as these statutes applied identical standards.  As under the ADEA, plaintiffs bringing

age-discrimination claims under the NYSHRL had the burden of proving that age was the "but-

for" cause of the challenged adverse employment action.  *See Gorzynski*, 596 F.3d at 105 n.6

("The law governing ADEA claims has been held to be identical to that governing claims made

under the NY[S]HRL . . . we assume, without deciding, that the Supreme Court's *Gross* decision

affects the scope of the NY[S]HRL law as well as the ADEA.") (citing *Sutera v. Schering Corp.*,

73 F.3d 13, 16 n.2 (2d Cir. 1995)).[14]  This standard, however, has recently changed.  "The

NYSHRL was amended on August 19, 2019 to provide that its provisions should be construed

liberally 'regardless of whether federal civil rights law, including those laws with provisions

---

[14] In *Gross*, the Supreme Court clarified that a plaintiff "bringing an ADEA disparate-treatment claim must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action[,]" rather than a contributing or motivating factor.  557 U.S. at 180.  In *Gorzynski*, the Second Circuit assumed that *Gross* affected the scope of the NYSHRL as well, as Circuit law understood the ADEA and NYSHRL to carry identical standards.  *See* 596 F.3d at 16 n.6.  Accordingly, courts in this jurisdiction treated the standards as identical.  *See, e.g.*, *Allen v. Chanel, Inc.*, No. 12 Civ. 6758 (LAP), 2015 WL 3938096, at *4 & n.3 (S.D.N.Y. June 26, 2015) (applying the "but for" standard in adjudicating ADEA and NYSHRL age discrimination claims).

worded comparably to the provisions of this article, have been so construed.'" *Deveaux v. Skechers USA, Inc.*, No. 19 Civ. 9734 (DLC), 2020 WL 1812741, at * 3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting Act of Aug. 12, 2019, sec. 6, 2019 N.Y. Laws 160 (codified at N.Y. Exec. Law § 300 (2019))).  In other words, the NYSHRL was amended to "render the standard for claims closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019); *see generally Williams v. N.Y.C. Transit Auth.*, 171 A.D.3d 990, 992–93 (N.Y. App. Div. 2019) ("[W]here an adverse employment action is shown to be 'motivated by [unlawful] animus, even in part, the defendant may be held liable' under the NYCHRL.") (quoting *Singh v. Covenant Aviation Sec., LLC*, 131 A.D.3d 1158, 1161 (N.Y. App. Div. 2015)).  The amendment was signed in August 2019 and applies to claims occurring on or after October 11, 2019, without retroactive effect. *See McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).

Both of Summit's theories of discrimination rest, in whole or part, on conduct post-dating the amendment's effective date.  As to the pre-termination theory of discrimination, for instance, Summit has testified that he was asked to clean studios "sometime after Thanksgiving" in 2019. Summit Dep. at 116–17.  And the termination decision itself occurred in December 2019.  JSUF ¶ 66.  Accordingly, the amended, more liberal standard of the NYSHRL applies.  Neither party alerted to the post-amendment standard in their briefs, analyzing the ADEA and NYSHRL claims as coextensive.[15]  That the parties briefed the NYSHRL claims under an outdated legal

---

[15] Equinox considered the ADEA and NYSHRL claims together throughout its filing. *See, e.g.,* "For claims under the ADEA and NYSHRL, Plaintiff 'must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action and not just a contributing or motivating factor.'" Def. Mem. at 9 (quoting *Gorzynski*, 596 F.3d at 106)). Summit made the same error: "Plaintiff's state law claims are analyzed under the same burden-shifting framework as his federal claim." Pl. Mem. at 9.

standard reinforces the reasons, articulated above in the discussion of Summit's NYCHRL

claims for not exercising supplemental jurisdiction over these claims.  Finding no strong reason

to exercise supplemental jurisdiction over the NYSHRL claims, the Court dismisses these, like

the NYCHRL claims, without prejudice.  *See, e.g.*, *Halkitis v. N.Y.C. Dep't of Educ.*, No. 19 Civ.

11753 (JMF), 2022 WL 392911, at *7 (S.D.N.Y. Feb. 9, 2022) (declining to exercise

supplemental jurisdiction over NYSHRL and NYCHRL claims as matters "best left to the courts

of the State of New York") (citations omitted); *Daniel v. City of New York*, 20 Civ. 11028

(PAE), 2021 WL 5988305, at *11 (S.D.N.Y. Dec. 16, 2021) (same).

## CONCLUSION

For the foregoing reasons, the Court grants Equinox's motion for summary judgment as

to Summit's ADEA claims, and declines to exercise supplemental jurisdiction over Summit's

NYSHRL and NYCHRL claims.  Summit's claims under the NYSHRL and NYCHRL are

dismissed without prejudice to Summit's right to re-file and pursue them in state court.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 32

and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: July 21, 2022
New York, New York